UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SPARKMAN & STEPHENS, LLC and SPARKMAN & STEPHENS HOLDING, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE MUSEUM SEAPORT MUSEUM, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 1:21-CV-00029-MSM-LDA |

### MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 80 & 84.) For the reasons that follow, the Court DENIES the Motion for Partial Summary Judgment of the plaintiffs, Sparkman & Stephens, LLC and Sparkman & Stephens Holding, LLC ("S&S"), and GRANTS in part and DENIES in part the Motion for Summary Judgment of the defendant, Mystic Seaport Museum, Inc. ("Museum" or "MSM").

### I. BACKGROUND

S&S is a naval architecture and brokerage firm that has designed yachts and other maritime vessels since its founding in 1929. The Museum is one of the world's leading maritime museums, which holds more than 130 collections of historical ship plans. This case arises from a dispute over a 1989 Agreement ("1989 Agreement") between S&S and the Museum governing the donative transfer of certain S&S

maritime drawings and associated records to the Museum for long-term preservation. Pursuant to the 1989 Agreement, upon donation, title to the S&S materials passed to the Museum and the Museum assumed an obligation to offer the materials to the public, including through the sale of copies subject to certain limited exceptions. (ECF No. 87-1 §§ II, VI, VII.) Presumably satisfied with the arrangement, in 2011, S&S made a further donation of its remaining historical plans and related materials to the Museum on the same terms as the 1989 Agreement. (ECF No. 109 ¶ 121.)

On August 15, 2018, Donald Tofias acquired S&S and sought to obtain control over access to S&S's historical drawings. (ECF No. 109 ¶¶ 145, 159.) Exactly one week after the acquisition, Mr. Tofias asked the Museum to "suspend sales" of copies of historical S&S plans and informed S&S staff that the Museum's reproduction and sale of S&S designs would be halted until a new agreement more favorable to S&S's interests could be negotiated. (ECF No. 109 ¶ 160; ECF No. 84-1 at 14.) Later, Mr. Tofias demanded that the Museum cut off public access to the S&S materials. (ECF No. 109 ¶ 172.) To date, the Museum has obliged Mr. Tofias' request. (*Id.* ¶ 161.)

On January 15, 2021, S&S filed this lawsuit alleging that the Museum breached the 1989 Agreement by (1) selling copies of S&S plans for use in the restoration of boats, (2) failing to properly preserve S&S materials, and (3) failing to maintain a log of sales for the years 2000 to 2004. (ECF No. 1; ECF No. 35 ¶¶ 76-88.) Additionally, S&S alleges six counts of copyright infringement, each premised upon the Museum's 2018 sale of plans for the boat *Gesture*, and one count of unjust enrichment. (ECF No. 35 ¶¶ 13-75, 89-93.) The Museum asserted counterclaims

against S&S for tortious interference with business relations and seeking a declaratory judgment that S&S's copyrights are invalid and unenforceable. (ECF No. 60.)

On April 24, 2023, both parties filed motions for summary judgment. S&S argues that the Court should grant summary judgment that (1) the Museum is liable for breach of contract, (2) the Museum has infringed various S&S copyright registrations; and (3) the Museum is not entitled to corrective advertising damages. (ECF No. 81-1.) Conversely, the Museum argues that the Court should grant summary judgment in its favor on all S&S's claims. (ECF No. 84-1.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

3

In ruling on a motion for summary judgment, the Court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). When evaluating "cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *Bonneau v. Plumbers & Pipefitters Loc. Union 51 Pension Tr. Fund ex rel. Bolton*, 736 F.3d 33, 36 (1st Cir.2013) (quoting *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir.2013)). "Summary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented 'is subject to conflicting interpretations, or reasonable [people] might differ as to its significance, summary judgment is improper.'" *Gannon v. Narragansett Elec. Co.*, 777 F. Supp. 167, 169 (D.R.I. 1991) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure, § 2725, at 104 (1983)).

### III.  DISCUSSION

Much of this case turns on whether the 1989 Agreement permits the Museum to sell copies of S&S drawings for the purpose of restoring existing boats. Thus, the Court begins its analysis by interpreting the 1989 Agreement. Despite the parties' antithetical interpretations of the 1989 Agreement, they were able to agree that New

York law governs the interpretation of the agreement itself. (*See* ECF No. 81-1 at 11.)

## A. Contract Interpretation

Under New York law, "the initial interpretation of a contract 'is a matter of law for the court to decide.'" *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). At the initial interpretation stage, the Court must determine whether the contract is ambiguous with respect to the question disputed by the parties. *See id.* "A contract is ambiguous under New York law 'if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156-57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014)). By contrast, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Chesapeake Energy Corp.*, 773 F.3d at 114 (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir.2010)).

"If the [C]ourt finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid

of extrinsic evidence." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). However, if the Court "concludes that a [contract] provision is ambiguous, the [C]ourt may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (quoting *Parks Real Est. Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir.2006)).

### 1. The 1989 Agreement is Ambiguous

The crux of the parties' dispute centers around the interpretation of Sections VII and X of the 1989 Agreement. Section VII states in relevant part:

> Sailplans and profiles, and arrangement drawings of decks and interiors (hereinafter called Category I drawings) may be reproduced and sold by MSM for research and publication, with a S&S/MSM credit line being required for the latter use. Reproductions of other drawings (hereinafter called Category II drawings) will be sold by MSM under a legally-binding, two-party agreement stating that they will be used exclusively for study or model-making, that they will not be copied, that *they will not be used for boatbuilding*, and that they will not be published or passed on to others. Category II drawings will not be released for publication without written approval from S&S. Third party violation of plan restrictions, such as boats being built without S&S agreement, will be handled on a case basis with legal action being initiated by either S&S or MSM on its own behalf.

(ECF No. 87-1 § VII) (emphasis added). Additionally, Section X states:

> Permission *to build boats* from any drawings in the S&S collection will be within the sole discretion of S&S who may negotiate directly with the builder, and any inquiries of this nature that come to MSM will be referred to S&S.

(ECF No. 87-1 § X) (emphasis added).

Pointing exclusively to the text of the above sections, S&S argues that the plain and ordinary meaning of the terms "boatbuilding" and "to build boats" encompass any building activities on boats, including restoration of existing boats. (ECF No. 81-1 at 13-15.) Conversely, relying on various dictionary definitions of the terms contained within the above sections, the Museum argues that the language was intended to prohibit only the construction of new boats. (ECF No. 84-1 at 40-47.) The language of the 1989 Agreement, however, simply does not compel one interpretation or the other. Thus, the Court finds that the 1989 Agreement is ambiguous. *See Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998) ("Contract language is ambiguous if it is reasonably susceptible of more than one interpretation....").

2. Extrinsic Evidence

When interpreting an ambiguous contract, the Court "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010). Summary judgment should be granted "where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'" *New York Marine & Gen. Ins. Co.*, 599 F.3d at 115 (quoting *Compagnie Financiere De Cic Et De L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir.2000). In other words, summary judgment is appropriate when "the ambiguities may be resolved through extrinsic evidence that is itself capable of only one

7

interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

Here, the record contains two forms of extrinsic evidence that unequivocally support the Museum's interpretation of the 1989 Agreement: (1) the testimony of witnesses involved in the drafting and negotiation of the 1989 Agreement and (2) the three-decades-long course of dealing between the parties.

### a. Evidence of the Drafters' Intent

In July 1987, Maynard Bray prepared and distributed the first draft of what became the 1989 Agreement. Between 1987 and 1989, the parties and their attorneys exchanged proposed revisions to the draft that Mr. Bray had prepared. (ECF No. 109 ¶¶ 52-53.) Ben Fuller negotiated the 1989 Agreement on the Museum's behalf, and Alan Gilbert negotiated and signed the 1989 Agreement on S&S's behalf. (*Id.* ¶¶ 48, 55-57.)

Mr. Bray testified that at the time of drafting the 1989 Agreement, it was his understanding that the term boatbuilding, as used in Section VII, referred to new construction, and did not incorporate restoration or rebuilding of existing boats. (ECF No. 88-1 at 35:23-37:18; ECF No. 109 ¶¶ 74-76.) He explained that the parties "never covered restoration in [the 1989 Agreement] because restoration wasn't on anybody's mind at the time." (*Id.* at 34:22-24.) Moreover, through his testimony, Mr. Bray affirmed that "no restriction, ultimately, was put on use of plans for restoration[.]" (*Id.* at 88:15-19.)

8

The witnesses responsible for negotiating the 1989 Agreement provided testimony consistent with Mr. Bray's interpretation of the document. Mr. Gilbert, who negotiated the agreement *on behalf of S&S*, gave a sworn declaration stating that "the language of Section VII of the 1989 Agreement gives MSM the right to sell copies of plans for restoration, but not new boat construction, without seeking S&S's permission." (ECF No. 87-2 ¶ 12.) Similarly, Mr. Fuller gave a sworn declaration stating that "the word 'boatbuilding' as used in the 1989 Agreement . . . refers to the construction of a new boat, not to the restoration of a boat that had already been built" and "the language of Section VII of the 1989 Agreement gives MSM the right to sell copies of plans for restorations, but not new boat construction, without seeking S&S's permission." (ECF No. 87-3 ¶¶ 8, 11.) In addition, Mr. Fuller stated "[t]he overriding intention of [the 1989 Agreement] was to ensure preservation of the collection, to make it accessible to anyone for study (*including as needed for restoration*) and model building, and to make sure that S&S controlled and benefited from any new boat construction." (*Id.* ¶ 5).

S&S points to nothing in the record to rebut this testimony. Instead, S&S claims that all three witnesses favor the Museum, and thus their testimony must be assessed by a jury. (ECF No. 108 at 17-18; ECF No. 109 ¶¶ 74-76.) But "our summary judgment duty to draw inferences in favor of the nonmovant does not permit us to offset uncontroverted testimony through adverse credibility determinations." *Geshke v. Crocs, Inc.*, 740 F.3d 74, 80 (1st Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Court finds

9

that there is no genuine dispute of material fact about the parties' intent at the time of contract formation, as all relevant extrinsic evidence supports the Museum's interpretation that the 1989 Agreement permits the sale of copies of S&S drawings for the purpose of restoring existing boats.

### b. Course of Dealings

The nearly thirty-year course of dealings between S&S and the Museum bolsters the Museum's interpretation of the 1989 Agreement. Between the execution of the 1989 Agreement on February 15, 1989, and Mr. Tofias' acquisition of S&S on August 15, 2018, S&S referred customer inquiries seeking S&S plans for use in boat restorations to the Museum. (ECF No. 109 ¶ 95.) Throughout this period, S&S owners and senior employees knew that the Museum was providing copies of plans to boat owners seeking to use the plans for purposes of restoration. (*Id.* ¶ 96.) Yet, before Mr. Tofias acquired S&S, no one associated with S&S ever alleged that the Museum had breached the 1989 Agreement. (*Id.* ¶ 120.)

"The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984) (citing *Old Colony Tr. Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L. Ed. 1410 (1913)). New York courts have "extended the course-of-dealings doctrine 'to include evidence that a party has ratified terms by failing to object,' provided there is 'an indication of the common knowledge and understanding of the parties.'" *Ward v. Nat'l Geographic Soc'y*, 284 F. App'x 822, 824 (2d Cir. 2008) (quoting *New Moon Shipping Co. v. MAN B & W*

10

*Diesel AG*, 121 F.3d 24, 31 (2d Cir.1997)). The undisputed evidence of the course of dealings between the parties under the 1989 Agreement compels the conclusion that the 1989 Agreement permits The Museum's sale of copies of S&S drawings for the purpose of restoring existing boats.

### B. The Museum is Entitled to Judgment as a Matter of Law on S&S's Breach of Contract Claim Based On Improper Reproduction and Sale

It is undisputed that all S&S's allegations of breach of contract related to the reproduction and sale of designs stem from sales that the Museum made for the purpose of restoring existing boats, which the Court has found is permitted by the 1989 Agreement. (ECF No. 109 ¶ 84.) The Museum is therefore entitled to summary judgment on this portion of S&S's breach of contract claim.

### C. The Museum is Entitled to Judgment as a Matter of Law on S&S's Copyright Infringement Claims

Similarly, S&S's copyright infringement claims are premised solely upon the Museum's sale of various *Gesture* drawings to *Gesture's* owner for use in restoration. (ECF No. 35 ¶¶ 13-75.) Given that the 1989 Agreement permits the Museum to sell S&S designs for the purpose of restoration, such copying cannot support a copyright infringement claim. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433, 104 S. Ct. 774, 784, 78 L. Ed. 2d 574 (1984) ("anyone who is authorized by the copyright owner to use the copyrighted work . . . is not an infringer of the copyright with respect to such use.") Thus, the Museum is entitled to summary judgment on S&S's copyright infringement claims.

### D. S&S's Remaining Breach of Contract Claims

S&S also alleges that the Museum has breached the 1989 Agreement by failing to properly preserve S&S materials ("Preservation Claim") and failing to maintain a log of sales for the years 2000 to 2003[1] ("Log Claim"). (ECF No. 35 ¶¶ 77-81, 87-88.)

#### 1. S&S's Preservation Claim

Section II of the 1989 Agreement states that the S&S "material will be maintained by MSM pursuant to the normal policies and practices of MSM[.]" (ECF No. 87-1 § II.) Both parties have introduced conflicting expert testimony about whether the Museum's care of the S&S materials complies with its normal policies and practices. (ECF No. 109 ¶ 188; ECF No. 83-20; ECF No. 87-12; ECF No. 87-14; ECF No. 87-15.) In support of its Motion for Summary Judgment, the Museum details the many inconsistencies and deficiencies in the testimony of S&S's expert. (ECF No. 84-1 at 58-66.) However, summary judgment may not be granted simply because an expert lacks credibility. "That 'the factual underpinning of an expert's opinion is weak'" is "'a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury.'" *Martinez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022) (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011)); *see also S.E.C. v. Razmilovic*, 738 F.3d 14, 35 (2d Cir. 2013) ("[P]erceived gaps, inconsistencies, or errors in the reasoning leading to an expert's opinion are

---

[1] S&S initially claimed that the Museum had failed to provide a log of sales for the years 2000 to 2004. (ECF No. 35 ¶ 87.) However, the Museum provided S&S with the original handwritten log of sales for the year 2004. (ECF No. 94-1.) Thus, for clarity purposes, the Court will refer only to the years 2000 to 2003 throughout its discussion of S&S's Log Claim.

12

matters that properly go to the weight of the evidence; and the weight of the evidence is a matter to be argued to the trier of fact[.]")).

In viewing the record in the light most favorable to S&S, the Court finds that there is a dispute of material fact about whether the Museum's care of the S&S materials complies with its normal policies and practices. Therefore, the Museum's Motion for Summary Judgment on this claim is denied.

### 2. S&S's Log Claim

Section IX of the 1989 Agreement states: "MSM will maintain a log of all S&S drawings sold and make this information available to S&S upon request." (ECF No. 87-1 § IX.) In 2020, S&S requested records of the Museum's sales of S&S drawings dating back to 1989. (ECF No. 109 ¶ 216.) In response, the Museum provided S&S with a log of sales for each year, except the years 2000 to 2003 – years for which the Museum could not locate its handwritten log of sales. (*Id.* ¶ 218.) Thereafter, the Museum retrieved the original sales invoices from the years 2000 to 2003 and provided S&S with a log of sales. (ECF No. 92-23.) Yet, S&S claims that the Museum breached the 1989 Agreement by failing to maintain a log of S&S drawings sold between 2000 to 2003. (ECF No. 35 ¶ 87.)

To prevail on their breach of contract claim, S&S "must establish "(1) an agreement, (2) adequate performance [on their part], (3) breach by [the Museum], and (4) damages." *Donohue v. Hochul*, 32 F.4th 200, 206–07 (2d Cir. 2022) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)). The first two elements are not in dispute. Nevertheless, S&S's Log Claim fails because

13

the evidence is insufficient to establish a breach by the Museum. Despite S&S's argument to the contrary, there is no genuine issue of material fact regarding whether the log that the Museum "reconstructed" can "actually substitute for the original log that the Museum was required to maintain[.]" (ECF No. 108 at 30.) The 1989 Agreement does not require the Museum to maintain any specific form of log, thus the Museum satisfied its obligation under the 1989 Agreement by maintaining original invoices for each sale made from 2000 to 2003. (ECF No. 87-1 § IX; ECF No. 87-24 at 78:8-11.) Moreover, it is undisputed that all of the Museum's sales prior to 2007 were to S&S directly. (ECF No. 109 ¶ 214.) Thus, during the years 2000 to 2003, the Museum contemporaneously informed S&S of every sale it made. Accordingly, the Museum is entitled to summary judgment on S&S's Log Claim.

### E. Rescission of the 1989 Agreement is Unavailable as a Matter of Law

Under New York law, "[r]escission is an extraordinary remedy, appropriate only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Courchevel 1850 LLC v. Espinosa*, No. 17 CV 799 (VB), 2020 WL 635498, at *4 (S.D.N.Y. Feb. 11, 2020), *aff'd sub nom. Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33 (2d Cir. 2021) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000). A claim for rescission, "seeks to restore the parties to status quo, as if the parties had never entered into the contract." *Unger v. Ganci*, 200 A.D.3d 1604, 161 N.Y.S.3d 546, 549 (2021) (citation omitted). Accordingly, the equitable remedy of rescission "may be invoked 'only when there is

lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored.'" *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 340 (S.D.N.Y. 2012) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972)).

In this case, rescission cannot effectively restore the parties to their pre-contract status quo. The Museum has provided over thirty-four-years of services from which S&S has benefitted, including dedicating thousands of hours and hundreds of thousands of dollars to the care and preservation of the S&S-donated materials. (ECF No. 109 ¶¶ 111-116.) Moreover, S&S has not asserted any reason why damages would not provide an adequate remedy should they prevail on their breach of contract claim. Accordingly, the equitable remedy of rescission is inappropriate, and the Museum's motion for summary judgment on this issue is granted.

### F. Unjust Enrichment

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572, 841 N.E.2d 742, 746 (2005). "Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142, 907 N.E.2d 268, 274 (2009). Consequently, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract . . .

15

claim." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790, 967 N.E.2d 1177, 1185 (2012).

Here, S&S argues that their unjust enrichment claim goes beyond the breach of contract issue because it "to some extent" relates to the Museum's donation revenue which is not covered by the 1989 Agreement. (ECF No. 108 at 47-49). This argument, however, is contradicted by S&S's discovery responses which state that "the underlying factual bases for S&S's claim for unjust enrichment are generally the same as the underlying factual bases for S&S's claims for breach of contract." (ECF No. 87-8 at 3.) Moreover, S&S's claim that the Museum has been unjustly enriched by donation revenue is inextricably intertwined with S&S's breach of contract claim, as demonstrated by S&S's own explanation of this theory of recovery:

> "MSM has received the benefit of advertising and displaying the S&S materials as part of its collection … [which] in turn served to provide MSM with donation revenue to which it was not entitled *because it has not been complying with its obligation under the 1989 Agreement, e.g., based on MSM's sale of plans for boatbuilding purposes, failure to properly maintain the S&S materials in MSM's possession, and failure to maintain logs and provide such logs to S&S upon request.*"

(*Id.* at 3-4) (emphasis added.) The Museum is thus entitled to summary judgment on S&S's unjust enrichment claim.

### G. The Museum May Pursue Corrective Advertising Damages

S&S seeks summary judgment on the Museum's claim for corrective advertising damages on the basis that the Museum did not timely disclose this theory of damages. The Court finds that the Museum's disclosure of its intent to seek collective advertising damages was timely. Therefore, S&S's motion for summary judgment on this issue is denied.

## IV. CONCLUSION

For all these reasons, S&S's Motion for Partial Summary Judgment (ECF No. 80) is DENIED. The Museum's Motion for Summary Judgment (ECF No. 84) is GRANTED IN PART as to S&S's Copyright Infringement Claims (Counts I-VI), Breach of Contract Claims for "Improper Reproduction and Sales of MSM Materials" and "MSM's Failure to Keep an Appropriate Log of S&S Drawing Sales" (Count VII), and Unjust Enrichment (Count VIII) and is DENIED IN PART as to S&S's Breach of Contract Claim for "MSM's Failure to Properly Preserve S&S Materials" (Count VII ¶¶ 77-81).

The Counts and Counterclaims that remain to be decided by a factfinder are S&S's claim for Breach of Contract limited to "MSM's Failure to Properly Preserve S&S Materials" (Count VII ¶¶ 77-81), and the Museum's Counterclaims for Tortious Interference with Business Relations (Count I), Tortious Interference with Prospective Business Relations (Count II), and Declaratory Judgment of Invalid Copyrights (Count III).

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

August 17, 2023